OAKLAND COUNTY COMMISSIONER v OAKLAND COUNTY
EXECUTIVE

Docket No. 44521. Submitted December 5, 1979, at Lansing.—Decided
July 18, 1980.

Henry W. Hoot, an Oakland County Commissioner, the Oakland
County Prosecuting Attorney, the Oakland Board of County
Road Commissioners and the Oakland County Drain Commis-
sioner brought an action against the Oakland County Executive
and the Oakland County Treasurer for mandamus and declara-
tory and injunctive relief in the Oakland Circuit Court. The
Prosecuting Attorney, the Treasurer and the Board of County
Road Commissioners were dismissed as parties. The controversy
involved the Executive's veto of certain County Commission
resolutions, one to withdraw the county from participation in
SEMTA, a regional transportation authority, another to com-
bine the functions and duties of the County Drain Commis-
sioner with those of the Commissioner of Public Works, and a
third to appropriate funds for project engineer manager posi-
tions in the Public Works Department. The plaintiffs alleged
that the statute through which the Executive held office was
unconstitutional (1) as purporting to create a form of govern-
ment not authorized by the constitution, (2) as failing to pro-
vide for the election of a charter commission and the submis-
sion of a proposed charter to a popular vote, and (3) as divest-
ing the Board of Commissioners of constitutionally delegated
legislative and administrative powers to the County Executive.
Plaintiffs also alleged that the County Executive lacked the
authority to veto the resolutions. The court, Robert L. Templin,

REFERENCES FOR POINTS IN HEADNOTES
[1] 56 Am Jur 2d, Municipal Corporations, Counties, and Other
Political Subdivisions § 98 *et seq.*
[2] 16 Am Jur 2d, Constitutional Law § 212.
[3, 5, 6] 56 Am Jur 2d, Municipal Corporations, Counties, and Other
Political Subdivisions § 189 *et seq.*
[4] 56 Am Jur 2d, Municipal Corporations, Counties, and Other
Political Subdivisions § 28.
[7, 8] 56 Am Jur 2d, Municipal Corporations, Counties, and Other
Political Subdivisions § 357 *et seq.*

J., granted summary judgment for defendants. Plaintiffs appeal. *Held:*

1. The statute providing for an optional unified form of county government is authorized by the constitution and is not infirm for the reasons alleged by plaintiffs.

2. The County Executive had the authority to exercise the vetoes in question.

Affirmed.

DANHOF, C.J., concurred, pointing out that the factual situation differed from *The Raven, Inc v City of Southfield,* 69 Mich App 691; 245 NW2d 370 (1976), *rev'd* 399 Mich 853 (1977).

1. CONSTITUTIONAL LAW — COUNTY GOVERNMENT — ORGANIZED COUNTIES.

The constitutional provisions for the government of organized counties are not self-executing; the rights bestowed and duties imposed may not be enforced without the aid of legislative enactment (Const 1963, art 7, §§ 1, 2, 7, 8).

2. CONSTITUTIONAL LAW — STATUTES.

Acts of the Legislature are presumptively constitutional.

3. COUNTIES — BOARDS OF COMMISSIONERS — CONSTITUTIONAL LAW.

The constitution compels the formation and delimits the powers and duties of a board of commissioners in all organized counties without regard to their form of organization.

4. COUNTIES — UNCHARTERED COUNTIES — STATUTES — OPTIONAL UNIFIED COUNTY GOVERNMENT.

The statute providing for an optional unified form of county government for unchartered counties is authorized by the constitution and is not infirm either for failing to provide for the election of a charter commission and submission of a proposed charter to the electorate or for transferring legislative and administrative power from the board of commissioners to the county executive (MCL 45.551 *et seq.;* MSA 5.302[51] *et seq.).*

5. COUNTIES — COUNTY EXECUTIVE — BOARD OF COMMISSIONERS.

The distribution of power between the county executive and the board of commissioners in an optional unified form of county government is within the province of the Legislature and not constitutionally derived.

6. COUNTIES — BOARDS OF COMMISSIONERS — CONSTITUTIONAL LAW.

The constitutional power of the Legislature to confer legislative power upon the county boards of commissioners implies author-

ity to suspend, revoke or circumscribe that power (Const 1963, art 7, § 8).

7. PUBLIC OFFICERS — VETO POWER — LEGISLATIVE FUNCTION.

   The purpose of a veto power, a legislative function, is to guard against the passing of bad laws through haste, inadvertence or design.

8. COUNTIES — OPTIONAL UNIFIED COUNTY GOVERNMENT — COUNTY EXECUTIVE — VETO POWER.

   The veto power of a county executive under an optional unified form of county government extends to any action of the board of commissioners, including a resolution to withdraw from a regional transportation authority and to merge the functions of the public works commissioner and the drain commissioner.

*Denison, Porter & Bartush,* for plaintiffs.

*Hardig, Goetz, Heath & Plunkett,* for defendant Oakland County Executive.

Before: DANHOF, C.J., and BEASLEY and CYNAR, JJ.

CYNAR, J. This action was commenced on August 28, 1978, against Daniel T. Murphy in his capacity as Oakland County Executive by the filing of plaintiffs' five-count complaint for mandamus and declaratory and injunctive relief in the Oakland County Circuit Court. The case was assigned to Judge Robert L. Templin. Count III of the complaint, involving plaintiff L. Brooks Patterson, Oakland County Prosecuting Attorney, and C. Hugh Dohany, Oakland County Treasurer, as defendant, was dismissed on January 9, 1979. Neither plaintiff Patterson nor defendant Dohany are parties to this appeal. Count V, involving the Board of County Road Commissioners, was dismissed upon motion therefor on February 1, 1979.

On February 20, 1979, the trial judge ruled, in an oral opinion from the bench, that 1973 PA 139

was constitutional and that vetoes exercised by appellee Murphy were within his power as county executive. By an order dated March 19, 1979, the trial court denied plaintiffs' motion for summary judgment and granted the defendant county executive's motion for summary judgment on Counts I, II, and IV.

On June 27, 1979, this Court granted an unopposed motion of the Board of County Commissioners to be dropped as a party appellant. This appeal is taken by appellants Henry W. Hoot, an elected County Commissioner of Oakland County, and George W. Kuhn, the elected Drain Commissioner of Oakland County.

The opinion of the trial court and this appeal concern the legal issues raised by: Count I of the complaint (constitutionality of 1973 PA 139); Count II (validity of appellee's veto of the Oakland County Board of Commissioners' resolution withdrawing Oakland County from the Southeastern Michigan Transportation Authority (SEMTA); and Count IV (the authority to veto actions of the Board of Commissioners with respect to the office of the Oakland County Drain Commissioner).

On appeal, no transcript of the proceedings held in the trial court has been made available as required by GCR 1963, 812.2(a); however, on June 8, 1979, the trial court issued an order to omit as part of the record the transcription and filing of the oral arguments of counsel made below.

Oakland County was incorporated in 1850 under article 10, § 1 of the Michigan Constitution of 1850. On August 6, 1974, the electors of Oakland County voted to adopt an optional unified form of county government as provided for by 1973 PA 139, MCL 45.551 *et seq.;* MSA 5.302(51) *et seq.* Oakland County has never adopted a charter and

has not proceeded to operate with an elected charter commission.

The facts underlying the three vetoes which constitute the substance of this appeal are as follows. On March 4, 1976, the Board of Commissioners resolved to combine the powers, duties and functions of the drain commissioner with those of the public works commissioner. Defendant county executive vetoed the resolution on March 12, 1976, stating his reasons for the veto by letter. A motion to override the veto failed by a vote of 15 to 11 on April 13, 1976. In 1977, the Board of Commissioners passed a resolution amending the proposed 1978 county budget by approving certain salary rates and employment classification changes. By letter dated December 28, 1977, defendant county executive vetoed a line item providing for the position of project engineer manager. A February 2, 1978, vote of the Board of Commissioners on a motion to override the veto failed by a vote of 10 to 12. On April 6, 1978, the Board of Commissioners, by vote of 18 to 8, elected to withdraw from SEMTA:

"NOW, THEREFORE, BE IT RESOLVED, that the Oakland County Board of Commissioners withdraw the County of Oakland from SEMTA, and establish a separate transportation authority as provided under Public Act 266 and direct State Treasurer Allison Green to forward those monies collected from Oakland County to Oakland County."

This resolution was vetoed by defendant county executive on April 13, 1978; on April 20, 1978, the Board of Commissioners failed to override the veto by a vote of 7 to 18. The Board of Commissioners propounded another resolution to terminate Oak-

land County's participation in SEMTA on September 1, 1978.

The plaintiffs' action is for mandamus, declaratory and injunctive relief. Count I of plaintiffs' complaint alleged that 1973 PA 139, the act through which defendant Oakland County Executive occupies his office, is void and unconstitutional: (1) as purporting to create a form of county government not authorized by article 7, §§ 2, 7, and 8 of the Michigan Constitution of 1963; (2) as failing to provide for the election of a charter commission and the submission of a proposed county charter to popular vote as constitutionally and statutorily mandated; and (3) as divesting the Board of Commissioners of constitutionally delegated legislative and administrative powers by transferring sweeping authority to the county executive. In Count II, plaintiffs contended that the County Executive lacked either the authority or the power to veto the vote of the Board of Commissioners to withdraw from SEMTA. Count IV concerns the validity of appellee's veto of the resolution combining drain and public work functions defined by three acts under appellant Kuhn as public works commissioner, and the validity of appellee's veto of a line item in the 1978 county budget authorizing four "Project Engineer Manager" positions for appellant Kuhn's department.

I. CONSTITUTIONALITY OF 1973 PA 139

Const 1963, art 7, § 1 provides that: "Each organized county shall be a body corporate with powers and immunities provided by law."

In relevant part, art 7, § 2 states that: "The law may permit the organization of county government

in form different from that set forth in this constitution * * *."[1]

Art 7, § 7, mandates the establishment of a board of county commissioners (board of supervisors) in all organized counties, while art 7, § 8, delineates the general nature of the powers and duties which devolve upon such board, but not their scope.[2]

The language excerpted from §§ 1, 2, 7, and 8 of

---

[1] The constitutional convention of 1961 official comment to this section, which may properly be employed by courts as an aid in construing a constitutional provision open to question, *Regents of the University of Michigan v State of Michigan,* 395 Mich 52, 60; 235 NW2d 1 (1975), notes:

"Convention Comment: This is a new section enabling counties, by vote of the people, to adjust their governmental structure to meet modern problems effectively.

"The question of electing a charter commission to frame a charter may be put on the ballot by vote of the board of supervisors; or upon petition of five per cent of the electors the question must be put on the ballot. If the proposal is approved by the people, a charter commission is then elected.

"The charter commission is limited by legislative action in the structural changes it may propose. *But the legislature is authorized to permit county government 'in form different from that set forth in this constitution.'* To become effective, the charter framed by the commission must be approved by a vote of the people.

"A county charter may authorize the county to adopt resolutions and ordinances 'relating to its concerns,' subject to law. This means that the charter county need not have specific permission from the legislature to perform local functions and that *such activities may be* limited only by legislative enactment.

"The charter county would be required to comply with property tax rates and debt limits established by general law. Such a county, however, is given new powers to levy taxes 'other than property taxes,' subject also to limitations in this constitution or by law.

"This home rule section makes it possible for those counties with specific problems to deal with them effectively, *but does so without* disturbing unnecessarily the government of other counties in the state." (Emphasis added.)

[2] Const 1963, art 7, § 7, reads as follows:

"Sec. 7. A board of supervisors shall be established in each organized county consisting of one member from each organized township and such representation from cities as provided by law."

Const 1963, art 7, § 8, states:

"Sec. 8. Boards of supervisors shall have legislative, administrative and such other powers and duties as provided by law."

art 7 of the Constitution of 1963 make it clear that those sections were not intended to operate *ex proprio vigore*. *Detroit v Oakland Circuit Judge*, 237 Mich 446, 449-450; 212 NW 207 (1927), *Saginaw County v State Tax Comm*, 54 Mich App 160, 165; 220 NW2d 706 (1974), *aff'd* 397 Mich 550; 244 NW2d 909 (1976). As these provisions are not self-executing, the rights which they bestow and the duties which they impose may not be enforced without the aid of legislative enactment. *Detroit, supra,* 450.

A final constitutional provision of relevance is art 7, § 34, which reads:

"The provisions of this constitution and law concerning counties, townships, cities and villages shall be liberally construed in their favor. Powers granted to counties and townships by this constitution and by law shall include those fairly implied and not prohibited by this constitution."

In order to implement art 7, § 2, the Legislature passed 1966 PA 293, MCL 45.501 *et seq.;* MSA 5.302(1) *et seq.,* which details the framework for establishing charter counties. Section 14 of the act, MCL 45.514; MSA 5.302(14), provides in subsection (a) for an elected salaried county executive, and in subsection (b) for the election of a legislative body to be known as the county commissioners.

In 1973, the Legislature passed 1973 PA 139,[3] the constitutionality of which is now called into question by plaintiffs. The act, denominated "optional unified form of county government", declares in its preamble that its purposes are:

"* * * to provide forms of county government; to provide for county managers and county executives and

_____

[3] MCL 45.551 *et seq.;* MSA 5.302(51) *et seq.*

to prescribe their powers and duties; to abolish certain departments, boards, commissions, and authorities; to provide for transfer of certain powers and functions; to prescribe powers of a board of county commissioners and elected officials; to provide organization of administrative functions; to transfer property; to retain ordinances and laws not inconsistent with this act; and to provide methods for abolition of a unified form of county government."

Under MCL 45.551; MSA 5.302(51), an unchartered county, such as Oakland County, may adopt an optional unified form of county government. Under such form of government, a county is required to include either an appointed county manager or an elected county executive. MCL 45.552; MSA 5.302(52). Oakland County chose the latter course.

As noted above, Oakland County adopted this form of government pursuant to the strictures found in MCL 45.553; MSA 5.302(53), through initial adoption thereof by the board of commissioners and subsequent approval by the voters.

With this background, we now address each of plaintiffs' attacks on the constitutionality of 1973 PA 139. First, we are unable to accept plaintiffs' contention that Const 1963, art 7, §§ 2, 7, and 8 do not authorize the "optional unified form of county of government", the adoption of which in Oakland County was originally recommended by the board of commissioners.

We must read the above constitutional provisions, which all relate to the same subject matter, as a whole, in context and with an eye to harmonizing them so as to give effect to all. *Saginaw County, supra,* 54 Mich App 160, 165, *Jones v Ypsilanti,* 26 Mich App 574; 182 NW2d 795 (1970). So too, we take note of the fact that acts of the

Legislature are clothed with a presumption of constitutionality. *American Amusement Co, Inc v Dep't of Treasury,* 91 Mich App 573, 576; 283 NW2d 803 (1979).

Examining the above constitutional provisions with these objects in mind, as well as employing the convention comments quoted hereinbefore to aid our construction of the cited sections, we are led to the unavoidable conclusion that art 7, §§ 2, 7, and 8 indeed provide for the specific unchartered form of county government envisaged by 1973 PA 139. Art 7, § 2, allows for the establishment of county government in forms other than chartered, while art 7, § 7, compels the formation of a board of commissioners in all *organized* counties without regard to the *form* of that organization. Art 7, § 8, generally circumscribes the powers and duties of such boards, again without regard to the *form* of county government under which such boards operate.

Reading these provisions together, while being mindful of the convention comments to art 7, § 2, we find no proviso in the Constitution which would either proscribe the establishment of an unchartered form of county government or preclude the Legislature from creating a number of sub-categories within the unchartered form. Article 7, § 34 supports the proposition that counties were to be given great latitude with respect to the form of government they utilize, which in turn cuts in favor of allowing the Legislature to place maximal options at the counties' disposal. Finally, art 7, § 1 gives to the Legislature sweeping authority to determine the powers of counties. We therefore conclude that the optional unified form of county government is clearly authorized by the Constitution of 1963; specifically, art 7, §§ 2, 7, and 8.

Since the Constitution allows for the establishment of an optional unified form of county government, we reject summarily plaintiffs' argument that 1973 PA 139 is unconstitutional for failing to provide for the election of a charter commission and submission of a proposed county charter to the electorate for a popular vote. Article 7, § 2 plainly leaves room for unchartered forms of county government, of which the optional unified form is one. If an *unchartered* form of county government is constitutional, *ipso facto* there is no constitutional mandate calling for charter commissions or adoption of a county charter in all counties.

Finally, we do not perceive 1973 PA 139 to be constitutionally infirm because it divests the board of commissioners of constitutionally delegated legislative and administrative powers, by transferring board authority to the county executive. As stated above, art 7, § 8, is not a self-executing provision. Thus, it requires legislative enactment to enforce any rights and duties enumerated therein. Moreover, art 7, § 8 merely recites the *nature* of the powers and duties entrusted to the board of commissioners, not the scope thereof, leaving the extent of the same to be determined by legislative enactment.[4] *Cf., Crain v Gibson,* 73 Mich App 192, 200; 250 NW2d 792 (1977), *lv den* 400 Mich 828 (1977). The distribution of power as between the county executive and the board of commissioners is thus initially a matter within the province of the Legislature and not constitutionally derived.

Both 1966 PA 293 and 1973 PA 139 provide for the office of county executive, the former allowing

[4] In MCL 45.514(b); MSA 5.302(14)(b), the Legislature, with respect to charter counties, provided for delineating the scope of the board's powers within the county charter itself. The scope of the board's powers in optional unified counties is laid out in MCL 45.556; MSA 5.302(56). See also note 6, *infra.*

the scope of his power to be set by the county charter,[5] the latter delimiting the extent of his authority within the act's provisions.[6] Lastly, nowhere in the Constitution of 1963 is it expressly stated that the board is the sole repository of county power. As the board of commissioners possesses no *inherent constitutional* power to act either legislatively or administratively but receives such power through legislative enactment, 1973 PA 139 represents but a *legislative* determination of the powers it deems wise to repose in the board under an optional unified form of county government, just as 1966 PA 293 represents a *legislative* decision to delegate the function of allocating power in a charter county to the charter commission in the first instance, subject to final approval by the affected voters. So too, the authority of the Legislature to confer upon the board of commissioners local legislative powers pursuant to art 7, § 8 implies the authority of the Legislature to suspend, revoke or circumscribe the power. *Wayne County Prosecuting Attorney v Wayne County Board of Comm'rs*, 44 Mich App 144, 151; 205 NW2d 27 (1972), *lv den* 389 Mich 768 (1973).

There being no constitutional interdiction against the legislative pronouncements found in 1973 PA 139, we find it to be constitutional in its entirety.

## II. EXERCISE OF THE VETO POWER BY THE COUNTY EXECUTIVE

MCL 45.561; MSA 5.302(61), provides:

[5] See MCL 45.514(a); MSA 5.302(14)(a).

[6] See MCL 45.558, 45.560, 45.561; MSA 5.302(58), 5.302(60), 5.302(61). The setting out of the powers of the county executive, as well as those of the board of commissioners, within 1973 PA 139 is necessitated, as is obvious, by the fact that an unchartered county form of government possesses no document equivalent to a charter which demarcates the powers reserved to executive and board respectively.

"Sec. 11. (1) The county executive may veto any ordinance or resolution adopted by the board, including all or any items of an ordinance appropriating funds. The veto shall be certified by the county executive to the board of county commissioners within 10 days from date of adoption of the ordinance or resolution and the board may override the veto by a 2/3 vote of all members elected and serving.

"(2) Under the unified form of county government containing alternate B an ordinance or resolution shall become effective on approval of the county executive, on expiration of 10 days without approval or veto, or on the overriding of a veto in the manner above described."

The veto power is a legislative function, although it is not affirmative and creative, but is strictly negative and destructive. *Stadle v Battle Creek Twp*, 346 Mich 64, 69; 77 NW2d 329 (1956), *Wood v State Administrative Board*, 255 Mich 220, 224; 238 NW 16 (1931). "The purpose of the veto power is to guard against the passing of bad laws through haste, inadvertence, or design." 62 CJS, Municipal Corporations, § 423, p 810.

Plaintiffs argue that the resolutions to withdraw from SEMTA and to merge the offices of public works and drain commissioners were made pursuant to specific statutory authority granted it by the Legislature.[7] Arguing that 1973 PA 139 represents general legislation, plaintiffs contend that the special legislation under which the resolutions were passed takes precedence over the veto power granted the county executive in the act as exceptions to the general statute which must be given

_____

[7] The resolution to withdraw from SEMTA was passed pursuant to MCL 124.405(1); MSA 5.3475(105)(1). The resolution authorizing the merger of the two offices was adopted under the aegis of MCL 280.21(3); MSA 11.1021(3). These statutes are both parts of more comprehensive acts. We accept plaintiffs' contention regarding the specific nature of this legislation as well as the specific intent of the Legislature relative thereto.

effect to carry out legislative intent. Plaintiffs conclude that where, as here, a general intention is expressed and also a particular intention which is incompatible with the general one, the particular intention shall be considered as an exception to the general one. Plaintiffs cite *Mayor of Port Huron v City Treasurer of Port Huron,* 328 Mich 99, 111-112; 43 NW2d 77 (1950), as authority for their position.

While plaintiffs correctly state the general rule of law, we are unable to agree that the rule applies here. We do not find the conflict in legislation alleged by plaintiffs to be present. To the contrary, we find 1973 PA 139 to be completely harmonious with the Metropolitan Transportation Authorities Act of 1967, MCL 124.401 *et seq.;* MSA 5.3475 *et seq.,* as well as with the Drain Code of 1956, MCL 280.1 *et seq.;* MSA 11.1001 *et seq.*

The ability of the board of commissioners to vote in favor of a SEMTA withdrawal, or a public works/drain commissioner merger, does not conflict with the ultimate veto power of the county executive, nor with the board of commissioners' subsequent ability to override such vetoes. One represents legislative action; the other executive fiat. The subject matter covered by each does not directly overlap. Surely, the words "subject to veto" need not have been included by the Legislature as a part of the SEMTA withdrawal and merger enactments.

We reject out of hand plaintiffs' claim that the SEMTA withdrawal resolution was not subject to veto because it had regional implications whereas the veto power of the executive is restricted to purely county affairs. It is well-settled that the board's power to pass laws, regulations, ordinances or resolutions is likewise restricted to purely

county affairs. MCL 46.11(m); MSA 5.331(m),[8] *Arlan's Dep't Stores, Inc v Attorney General,* 374 Mich 70, 76-77; 130 NW2d 892 (1964). While the withdrawal from SEMTA may have had an indirect inter-county *effect,* the resolution itself could only bind Oakland County and would not operate beyond its boundaries. Thus, it would be a matter of "purely county affairs" and subject to veto. We do not consider the attorney general opinions alluding to the contrary, cited by plaintiffs, to be authoritative on this question. *Garcia v City of Warren Civil Service Comm,* 78 Mich App 603, 608; 261 NW2d 19 (1977).

Plaintiffs' contention that the veto power was intended to be exercisable only as to matters dealing with the optional unified form of county government is without merit. MCL 45.561; MSA 5.302(61), plainly and unambiguously refers to *any* action of the board of commissioners as a proper subject for exercise of the veto power. No judicial construction to the contrary is possible. *Dillon v Secretary of State,* 61 Mich App 588, 591; 233 NW2d 96 (1975), *lv den* 397 Mich 812 (1976), *inter alia.* The same may be said with respect to the veto of the budget line item in the 1978 county budget authorizing four project engineer manager positions. MCL 45.561(1); MSA 5.302(61)(1), in our opinion, expressly allows vetoes of such budget line items subject, of course, to the veto being overridden.

Finally, we address plaintiffs' contention that the veto of the merger resolution was invalid, as it divested the drain commissioner of vested powers in direct contravention of the commands found in

[8] The provision in effect at the time the veto was exercised was MCL 46.11; MSA 5.331. However, the differences between the former provision and the present one are not germane with respect to our inquiries.

1973 PA 139, specifically MCL 45.554; MSA
5.302(54).[9] We find this argument lacking in substance.

The *drain* commissioner's powers remained the
same as they were prior to the veto. In addition,
any proposed additional powers would not vest in
the *public works* commissioner until the resolution
was approved by the county executive or 10 days
expired without approval or veto or until the veto
was overridden. MCL 45.561(2); MSA 5.302(61)(2).
Until such time as the resolution became opera-

---

[9] The statute reads in relevant part:

"Sec. 4. (1) On the date the optional unified form of county government becomes effective all appointed boards, commissions, and authorities except the apportionment commission, airport zoning board of appeals, board of county canvassers, boards of determination for drainage districts, civil service commission, county drainage board, county department of veterans' affairs administrative committee or soldiers' relief commission, concealed weapons licensing board, election commission, jury commission, library commission, parks and recreation commission, social services board, tax allocation board, any board established to oversee retirement programs, any plat board, any mental health board, any hospital board, any intercounty drainage board, and any building authority established by the county individually or in conjunction with another unit of government and the boards of county road commissioners; and all elective county offices except those of county commissioner, prosecuting attorney, clerk, register of deeds, treasurer, sheriff, elected county auditors, and drain commissioner are abolished and the tenure of persons holding the office or appointment are terminated. Termination shall take effect whether or not it coincides with the end of a term of office or appointment. All county departments in conflict with the departmental organization established by this act are abolished. As used in this act, the term department or county department shall not be construed to include boards of county road commissioners.

"(2) Powers vested in an abolished office, board, commission, authority, or department, on the date the optional unified form of county government becomes effective, become general county government powers, and functions performed by the office, board, commission, authority, or department shall be carried on as provided in this act.

"(3) A board or commission which is excepted from this act pursuant to subsection (1) shall exercise the powers and duties as provided by law.

"(4) The power vested in the office of county prosecuting attorney, county sheriff, county register of deeds, county clerk, county treasurer, county drain commissioner, or the board of county road commissioners and elected county auditor shall not be minimized or divested by this act."

tive, no new powers would be acquired; therefore, none were subject to divestiture by veto.

Lastly, resolution No. 7468, also referred to as "The Public Works Merger Resolution", did not propose to grant power to the drain commissioner but bestowed the powers intended to be granted upon one county department headed by public works commissioners.[10] The exercise of veto power by the county executive in conjunction with this resolution did not diminish or divest the power vested in the office of the county drain commissioner.

III. CONCLUSION

Based upon all of the foregoing we conclude that the disposition in the court below was proper. We therefore affirm the decision of the circuit court.

Affirmed. No costs, a public question being involved.

BEASLEY, J., concurred.

DANHOF, C.J. *(concurring)*. I concur in the opinion of my colleagues. I write separately to describe what I perceive to be the differences between the case at bar and *The Raven, Inc v City of Southfield,* 69 Mich App 696; 245 NW2d 370 (1976), *rev'd* 399 Mich 853 (1977), upon which the plaintiffs have heavily relied.

*The Raven* presented the question of whether the mayor of a home rule city, being invested with a veto power pursuant to the city charter, could

---

[10] The resolution declared:

"Moved by Hoot that the County of Oakland resolve to combine the powers, duties and functions set forth in Act No. 185 of the Public Acts of 1957, as amended, Act No. 342 of the Public Acts of 1939, as amended, and this act into one (1) county department headed by the public works commissioners pursuant to the provisions of Act 40 of the Public Acts of 1956, as amended by Act 170 of 1974, as amended."

exercise that veto as to the city council's approval of an application for a liquor license under the provisions of MCL 436.17; MSA 18.988, which provides merely that such application was to be "approved by the local legislative body". The Supreme Court approved the reasoning of the dissenter in this Court, who maintained that the "plain meaning" of the statute committed the contested approval power to the local legislative body alone. 69 Mich App 696, 704.

In *The Raven,* the mayoral veto power was the product of the municipality's charter; the Home Rule Cities Act, in providing for the office of mayor, does not explicitly propose that the mayor exercise a veto power. See MCL 117.3; MSA 5.2073. In the case at bar the contested veto power, although surely granted, by the local electorate as in *The Raven,* is also the subject of the Legislature's explicit consideration. See MCL 45.561; MSA 5.302(61). Thus, that power cannot be as easily discounted as was the veto power at issue in *The Raven.*

It is not as clear in this case, as it was in *The Raven,* that the statute providing for the county's withdrawal from SEMTA, MCL 124.405(1); MSA 5.3475(105)(1), and the provisions authorizing merger of the offices of the Commissioner of Public Works and the Drain Commissioner, MCL 280.21(3); MSA 11.1021(3), were intended by the Legislature to be a simple grant of exclusive authority. Unlike the Liquor Control Act at issue in *The Raven,* these statutes require a two-thirds majority vote to perform the actions they authorize. Both actions are of an unusual nature. The extraordinary majority required for these actions reflects a policy limiting the county commission's power to act, rather than expanding it. Such a

policy says nothing of the Legislature's intent with respect to the executive veto provided for in the statute under which the Oakland County government is organized.

It may be further observed that, under the provisions of MCL 45.561; MSA 5.302(61), the same two-thirds majority required to withdraw from SEMTA or reorganize the office of the Commissioner of Public Works may override the veto of the executive. Thus, the addition of the executive veto to these actions is a virtual nullity, and the commission's powers in these matter are, as a practical matter, untouched by the veto. To bar the executive's veto power in this case would disturb the "Option B" governmental scheme proposed by the Legislature with no corresponding preservation of any other legislatively-established values or governmental schemes.