LIVONIA HOTEL, LLC v CITY OF LIVONIA

Docket No. 237609. Submitted September 10, 2003, at Detroit. Decided October 21, 2003, at 9:00 A.M.

Livonia Hotel, L.L.C., and Hooters of Livonia, Inc., brought an action in the Wayne Circuit Court against the city of Livonia and an unnamed building official of Livonia, seeking a waiver use approval (special use permit) and a certificate of occupancy and other approvals and permits as required to allow the operation of a proposed Hooters Restaurant within the restaurant portion of a hotel. The plaintiffs had sought a waiver use approval for the hotel's long-existing class B hotel liquor license and for Hooters' new class C liquor license after being advised that the class B license had been abandoned by reason of nonuse for over a year. The planning commission recommended that both petitions be denied, but the city council voted in favor of both by a four-to-three majority. The mayor vetoed the approvals, requiring a five-vote supermajority to override the veto, which the city council failed to achieve. The circuit court, John H. Gillis, Jr., J., granted the city's motion for summary disposition, stating that the property right had been abandoned and the mayor's veto was valid as being within the proper zoning approval procedure. The plaintiff hotel appealed, arguing that the mayoral veto was contrary to law and that the simple majority approval by the city council was effective in favor of the hotel and the restaurant.

The Court of Appeals held:

1. The mayor's veto was invalid; the city council's simple majority approval of the waiver use petitions is effective. The City and Village Zoning Act (CVZA) at MCL 125.584a requires a zoning ordinance to specify the body or official charged with reviewing special land uses and granting approval. The Livonia Zoning Ordinance specifies that the city council is that body (§§ 11.03 and 19.06). The mayor, who has a broad, general veto power under the city charter, which was approved under the Home Rule City Act (HRCA), MCL 117.1 et seq., is not mentioned in the waiver use permit process in the zoning ordinance. To the extent the city charter provision granting the mayor's broad veto power conflicts with the CVZA, the CVZA prevails over the city charter provision because a city charter pro-

vision may not conflict with any general law of the state according to the HRCA, MCL 117.36. The CVZA is also a more specific statute, so it prevails over a general charter provision regarding a mayor's veto power.

2. The circuit court erred in determining that the class B liquor license rights had been abandoned through nonuse for over one year. Although the zoning ordinance allows valid nonconforming uses, it considers a nonconforming use that has not been used in one year abandoned. Several Michigan Supreme Court cases define "abandoned" to include the intent to abandon a right to a nonconforming use, i.e., a voluntary decision to abandon. *Dusdal v City of Warren*, 387 Mich 354 (1972), and *Rudnik v Mayers*, 387 Mich 379 (1972). These definitions supersede the ordinance definition. In this case, there is no indication of any intent to abandon the use.

Reversed and remanded for entry of an order granting summary disposition for plaintiff.

1. ZONING — ORDINANCE — WAIVER USE PERMITS — DECISION MAKERS.

    A zoning ordinance may allow for special land use approval, but it must specify the body or official charged with reviewing and approving those uses; a general mayoral veto power over city council resolutions provided for only in the city charter does not grant authority to the mayor to veto special land use approval resolutions (MCL 125.584a, 117.36).

2. ZONING — WAIVER USE PERMITS — SPECIAL USE PERMITS — ABANDONMENT BY NONUSE.

    A zoning ordinance may not define abandonment of the use of a waiver use permit (special use permit) as nonuse within a specified period without consideration of intent by the permit holder to abandon use of the permit.

*Honigman Miller Schwartz & Cohn LLP* (by *Norman Hyman*) for the plaintiff.

*Sean P. Kavanagh*, City Attorney, and *Cathryn K. White*, Chief Assistant City Attorney, for the defendants.

Before: OWENS, P.J., and GRIFFIN and SCHUETTE, JJ.

PER CURIAM. In this zoning case, plaintiff appeals as of right from the October 11, 2001, order of dismissal

with prejudice entered by the Wayne Circuit Court. We reverse and remand.

## I. FACTS

Plaintiff owns and operates a Quality Inn hotel on Plymouth Road in Livonia. Plymouth Road, a major, heavily traveled, east-west thoroughfare that runs the entire length of the city, is zoned and used for commercial and industrial uses. There are a number of restaurants on Plymouth Road, many of which serve beer, wine, and other alcoholic beverages.

The Quality Inn hotel was initially developed as a Holiday Inn hotel in 1967. At the time, the Livonia Zoning Ordinance (LZO) permitted a two-story structure to be constructed within the existing C-2 zoning designation. According to defendant city, the LZO in effect at the time required that waiver use approval be obtained in order to operate a hotel. As a result, the property owners filed and were granted a waiver use permit in 1967 allowing the construction of the two-story Holiday Inn hotel.

The waiver use approval granted in 1967 was limited to hotel use because the LZO, at the time, provided that restaurants were permitted uses in C-2 zoning districts. Further, the restaurant or lounge on the property was permitted to serve alcoholic beverages, apparently pursuant to the class B hotel liquor license held by the Holiday Inn.

In 1968, the year after the Holiday Inn was constructed, the LZO was amended to provide that restaurants were allowed only as waiver uses (rather than permitted uses) in C-2 zoning districts. In addition, the LZO has since been amended to allow hotels as

permitted uses (rather than waiver uses) in C-2 zoning districts.

The LZO requires a separate waiver use approval in order to use a class C liquor license in connection with a restaurant in a C-2 zoning district. According to Mark Taormina, the city's planning director, "[t]he requirement that waiver use approval must be obtained in order to utilize a Class C liquor license in a C-2 zoning district was in effect when the Holiday Inn was constructed in 1967 and the requirement has remained continuously in effect since then." City records indicate that waiver use approval has never been granted for a class C liquor license at the property in question. In 1997, the LZO was amended to enlarge the class of liquor licenses that require waiver use approval in C-2 zoning districts and now includes tavern, club, class A hotel and class B hotel licenses, and microbrewers and brewpubs, as well as class C licenses. However, before the LZO was amended in 1997, a waiver use approval was not required for the use of a class B hotel liquor license at the property.

Since 1967, the property in question has been used as a hotel, becoming a Ramada Inn for a time, then a Terrace Inn, and finally a Quality Inn. Until some time in 1995, a restaurant and a lounge/night club occupied part of the hotel. Both the restaurant and the lounge/nightclub were licensed to sell alcoholic beverages for consumption on the premises. As already stated, the restaurant and the nightclub were apparently permitted to sell alcoholic beverages pursuant to the hotel's liquor license. The restaurant and the night club were uses accessory to the hotel and were permitted as waiver uses under the Livonia zoning ordinance.

In 1995, plaintiff purchased the property in question. "In 1995, the operator of the restaurant and night club vacated the premises." Since the closure of the restaurant and the nightclub in 1995, plaintiff has kept the hotel liquor license current and attempted to obtain a new operator for the restaurant. Despite numerous efforts, plaintiff was unsuccessful in attracting a restaurant operator to reopen the restaurant until May 2000. On September 6, 2000, plaintiff entered into a lease with Hooters of Livonia, Inc., to operate a restaurant in the restaurant portion of the premises. The Hooters restaurant would serve beer and wine, but not liquor, using Hooters own class C liquor license.

According to plaintiff, when the city was contacted in connection with the work of preparing the premises for Hooters' occupancy, the city's building official informed John Glasnak, plaintiff's managing representative, that plaintiff would be required to obtain a new waiver use approval because the prior restaurant use had been discontinued for over one year, and, thus, the right to operate a restaurant had been "abandoned" under § 18.18 of the LZO. Plaintiff stated that it "never even considered the idea of abandoning the restaurant use."

Plaintiff filed a waiver use petition with the city on November 2, 2000. Plaintiff was required to file a waiver use petition because the city claimed that the prior restaurant use had been discontinued for more than one year. However, according to plaintiff, it already had waiver use approval for a restaurant. Hooters also filed a waiver use petition. A separate waiver use petition was required because Hooters wanted to use its class C liquor license in connection

with the operation of its restaurant and because there had not been a previous use of such a license at this location.

The planning commission conducted a public hearing on both petitions on December 12, 2000. At the conclusion of the public hearing, the planning commission recommended that both petitions be denied.

The city council then considered the waiver use petitions at a public hearing conducted on March 28, 2001, and a regular meeting held on May 2, 2001. The city council approved the waiver use petitions, each by a four-to-three vote, at its regular meeting on May 2, 2001. On May 7, 2001, the mayor vetoed the city council's approval of the waiver use petitions.

On June 15, 2001, plaintiff and Hooters filed a seven-count complaint seeking a declaratory judgment that would state, in pertinent part, that plaintiff "has a lawful vested right to the proposed restaurant on the premises, which has not been abandoned" and seeking an order requiring the city to issue "a certificate of occupancy and such other approvals and permits as are required to permit the operation of the proposed Hooters restaurant within the restaurant portion of the premises upon presentation of plans which comply with the City's building code." On July 2, 2001, defendants answered the complaint and set forth their affirmative defense, requesting that judgment be entered against plaintiff and Hooters for no cause of action. On August 2, 2001, plaintiff and Hooters moved for summary disposition under MCR 2.116(C)(9) (defendants have failed to state a valid defense to the claims asserted against them) and MCR 2.116(C)(10) (no genuine issue of material fact). In their response on August 29, 2001, defendants

requested that plaintiff and Hooters' "appeal" be dismissed as "procedurally improper," and, alternatively, that summary disposition be granted in favor of defendants pursuant to MCR 2.116(C)(8) (failure to state a claim on which relief can be granted) and (C)(10).

A hearing regarding the parties' cross-motions for summary disposition was held on September 6, 2001. After hearing argument, the trial court denied plaintiff's and Hooters' motion for summary disposition. In pertinent part, the trial court stated:

> Clearly the City had the right to require—first of all, the restaurant was abandoned.
>
> Secondly, the license itself was a Class C license which is a new non conforming [sic] use. So clearly the proper procedure the plaintiff had applied to the zoning—or the Planning Commission and then go to City Council, which they did. The City Council denied it by a four to three vote the mayor vetoed, and the city council decided not to override the veto,. and the majority was one vote short.
>
> As far as the legal procedures, that was perceived or conducted by the city in accordance with the law. The proper procedures were there. He had to go before the Planning Commission, City Council, and then has the right to do so. Plaintiff came up with one vote short with the City Council. So the motion for summary disposition is denied.
>
> *     *     *
>
> The City had the right to reject [the waiver petitions]. They need one more vote. The bottom line here is the claim of Livonia Hotel, which is Hooters, came up one vote short with the City Council and Mayor. Proper legal procedure was followed; they don't have the vote. That's the bottom line.

On October 8, 2001, the trial court entered an order dismissing the case with prejudice.

## II. JURISDICTION

In their appeal brief, defendants argue that plaintiff is not entitled to an appeal as of right under MCR 7.203(A), but is required to seek leave to appeal under MCR 7.203(B), because the decision challenged by plaintiff "is properly the subject of a Circuit Court appeal from the decision of the City Council pursuant to Const 1963, art 6 [,] § 28." As set forth in Const 1963, art 6, § 28:

> All final decisions, findings, rulings and orders of any administrative officer or agency existing under the constitution or by law, which are judicial or quasi-judicial and affect private rights or licenses, shall be subject to direct review by the courts as provided by law. This review shall include, as a minimum, the determination whether such final decisions, findings, rulings and orders are authorized by law; and, in cases in which a hearing is required, whether the same are supported by competent, material and substantial evidence on the whole record. . . .

Defendants rely, in part, on *Krohn v Saginaw*, 175 Mich App 193; 437 NW2d 260 (1988), in support of their argument that the trial court's dismissal of plaintiffs' complaint in this case arose from an appeal to the circuit court, not an original action, because plaintiffs' claims "relate to the denial of its waiver use petitions and the procedures employed in reaching that decision." We disagree.

### A. STANDARD OF REVIEW

Questions of law are reviewed de novo. *Sun Communities v Leroy Twp*, 241 Mich App 665, 668; 617 NW2d 42 (2000).

### B. ANALYSIS

As plaintiff points out in its reply brief, the present case does not fall within the exception to an appeal as of right that is listed in MCR 7.203(A)(1)(a). As plaintiff rightly notes, "[t]his suit has not been treated as an appeal." Plaintiffs' complaint raised issues that "had nothing to do with whether appellant was entitled to special use approval." Rather, plaintiffs challenged the legal authority of the mayor to veto the city council's approval of a special use, asserted that they had a vested right to a restaurant licensed to serve alcoholic beverages, and "challenged on constitutional grounds the validity of the zoning ordinance's treatment of restaurants in hotels." To hold that the present appeal is not an appeal of right from the circuit court's decision in this case would be contrary to MCR 7.203(A).

### III. ABANDONMENT

Plaintiff argues that the trial court erred in finding that plaintiffs had abandoned the restaurant use of the property. We agree that the trial court erred in finding that plaintiffs had abandoned the property, but we do not agree with plaintiff's contention that plaintiff had a vested right to have a restaurant operate on the property using a class C liquor license.

### A. STANDARD OF REVIEW

This Court reviews de novo a trial court's grant or denial of summary disposition. *Sun Communities, supra* at 668. Summary disposition of all or part of a claim or defense may be granted when

[e]xcept as to the amount of damages, there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law. [MCR 2.116(C)(10).]

A motion for summary disposition under MCR 2.116(C)(10) tests whether there is factual support for a claim. *Spiek v Dep't of Transportation*, 456 Mich 331, 337; 572 NW2d 201 (1998); *Mino v Clio School Dist*, 255 Mich App 60, 67; 661 NW2d 586 (2003). When deciding a motion for summary disposition, a court must consider the pleadings, affidavits, depositions, admissions, and other documentary evidence submitted in the light most favorable to the nonmoving party. *Ritchie-Gamester v City of Berkley*, 461 Mich 73, 76; 597 NW2d 517 (1999).

B. ANALYSIS

The record indicates that a waiver use petition was granted in 1967 for the construction of the Holiday Inn hotel. At the time the Holiday Inn was constructed in 1967, restaurants were permitted uses in C-2 zoning districts. Further, at the time of the opening of the Holiday Inn in 1967, the restaurant and the lounge/nightclub on the property were permitted to serve alcoholic beverages, apparently pursuant to the class B hotel liquor license held by the Holiday Inn. After the construction of the Holiday Inn, the LZO was amended in 1968 to designate restaurants as waiver uses in C-2 zoning districts. Further, in 1997, the LZO was amended again to designate establishments having class B hotel liquor licenses as waiver uses in C-2 zoning districts. Restaurants were permitted uses in C-2 zoning districts when the waiver use was granted

in 1967 to operate a hotel on the property; therefore, a waiver use was never granted for a restaurant or nightclub/lounge on the property. Likewise, there is no indication that a waiver use was ever granted to permit a restaurant or lounge on the property to serve alcoholic beverages.

The LZO was amended in 1968 to designate restaurants as waiver uses in C-2 zoning districts, and, as a result, the restaurant use in the hotel became a nonconforming use after the Holiday Inn was initially opened. As set forth in part in § 18.17 of the LZO:

> The lawful use of land or a structure exactly as such existed at the time of the enactment of this ordinance, may be continued, except as provided in Section 18.18 of this ordinance, although such use or structure does not conform with the provisions of this ordinance. Such a use, where lawfully continued pursuant to the provisions of this section, shall, for the purpose of this ordinance, be know [sic] as a "Valid Nonconforming Use"; but where such use is not thus lawfully continued, the same, for the purpose of this ordinance, shall be known as an "Invalid Nonconforming Use."[1]

Although plaintiff claims that there was no evidence that there was ever a change in the zoning ordinance that made restaurant use nonconforming because "the restaurant was a use permitted by the zoning ordinance, albeit as a waiver use, on the premises," defendants rightly contend that the restaurant use in plain-

---

[1] As plaintiff points out, § 18.17 incorporates the definition of nonconforming use set forth in the City and Village Zoning Act, the zoning enabling statute, in which MCL 125.583a(1) provides, in pertinent part, that "[t]he lawful use of land or a structure exactly as the land or structure existed at the time of enactment of the ordinance affecting that land or structure may be continued . . . although that use or structure does not conform with the ordinance."

tiff's hotel became nonconforming after 1968, because restaurant uses in C-2 zoning districts were not permitted unless the waiver use standards were met and specific approval was granted for the waiver use. Given that a waiver use had not been approved for the restaurant in the hotel after 1968, it follows that the restaurant use in plaintiff's hotel became a valid nonconforming use after 1968, because "such use . . . does not conform with the provisions of this ordinance." LZO § 18.17.

In addition, use of a class B hotel liquor license in the restaurant became a nonconforming use after the LZO was amended in 1997 to designate establishments having class B hotel liquor licenses as waiver uses in C-2 zoning districts. .

While the operation of a restaurant in the hotel was a valid nonconforming use after 1968, there is no evidence that plaintiff abandoned this use, as defendants allege. Section 18.18 of the LZO addresses the abandonment of a nonconforming use of property. Specifically, it provides, in pertinent part, "Actual discontinuance of such valid nonconforming use for a period of one (1) year, either as to the whole or any part of a building or parcel of land, in which case such discontinuance shall be considered an abandonment of said use[.]" LZO § 18.18(b).

As plaintiff points out, the Court in *Dusdal v City of Warren*, 387 Mich 354; 196 NW2d 778 (1972), and *Rudnik v Mayers*, 387 Mich 379; 196 NW2d 770 (1972), addressed the definition of "abandonment" in the context of zoning law. As stated in *Dusdal, supra* at 360:

> The record does not support a finding of legal abandonment. Abandonment in the contemplation of the law is

something more than mere nonuser. It is rather a nonuser combined with an intention to abandon the right to the nonconforming use. The burden of proving the abandonment was on the city. It introduced no evidence from which it would be reasonable to conclude that the plaintiff ever intended to relinquish or abandon his vested right to use his property in the manner in which it was being used prior to the residential zoning amendment.

In *Rudnik, supra* at 384, the Court stated, "The necessary elements of "abandonment" are intent and some act or omission on the part of the owner or holder which clearly manifests his voluntary decision to abandon."

As plaintiff correctly notes, "Section 18.18 is in direct contravention of the Supreme Court's holdings in *Rudnik* and *Dusdal*" because it defines abandonment solely on the basis of "actual discontinuance of such valid nonconforming use for a period of one (1) year," LZO 18.18(b), without requiring an intent to abandon the right to the nonconforming use. Further, as plaintiff correctly points out, there was no genuine issue of material fact in this case whether there was an abandonment. As indicated in Glasnak's affidavit, after purchasing the property in 1995, plaintiff continued to operate the hotel and has kept the hotel liquor license in full effect even after the operator of the restaurant ceased the operation of the restaurant. It is undisputed that Glasnak, as plaintiff's managing representative, then began to search for a new operator for the restaurant, which culminated in a lease with Hooters in September 2000. We agree with plaintiff that the "continued efforts to reopen a restaurant in the hotel [negates] any suggestion that Appellant abandoned its waiver use for a restaurant licensed to serve liquor." The record indicates that, as a matter of

law, plaintiff did not abandon its restaurant use. Thus, the trial court erred in finding that "the restaurant was abandoned."

Nevertheless, although the trial court erred in finding that plaintiff had abandoned its restaurant use, it does not follow that plaintiff was thereby entitled to summary disposition on this basis. Although plaintiff frames the issue in terms of having a vested right to have the Hooters restaurant in the hotel because it had a waiver use for a restaurant licensed to dispense alcoholic beverages pursuant to its class B hotel liquor license, defendants point out that Hooters sought approval to use its own class C liquor license in connection with its operation of the restaurant. As defendants rightly note, "[t]his type of use is a new use for this location and has always required waiver use approval under the applicable provisions of the LZO." Defendants claim that plaintiff did not have a vested right of a valid nonconforming use to operate a restaurant on the property using a class C liquor license.

In its reply brief, plaintiff contends that the LZO, as amended in 1997, "does not require waiver use approval for establishments having Class C liquor licenses; it requires waiver use approval for 'Establishments having liquor licenses *such as* Class C, Tavern, Club, Class A Hotel, Class B Hotel licenses and Micro brewers and Brewpubs . . . .' " quoting from LZO § 11.03(h). According to plaintiff, "[t]he distinction is significant" because "[t]he use which the ordinance makes a special use is a licensed restaurant." There was a licensed restaurant on the property since 1967, and as a result, plaintiff claims that it had a vested

right to a restaurant licensed to serve liquor, provided that such use was not abandoned.

Although it is true that plaintiff had a vested right to operate a restaurant licensed to serve alcoholic beverages pursuant to its class B hotel liquor license, we agree with defendants that it did not have a vested right to operate a restaurant pursuant to Hooters' class C liquor license because this constituted a new use of the property. As a result, plaintiff and Hooters were each required to file a waiver use petition because this constituted a change in the use of the property. Plaintiff had no vested right to have Hooters, a class C liquor licensed establishment, operate a restaurant in the hotel; thus, it follows that the trial court did not err in denying plaintiff's motion for summary disposition on this basis because waiver use approval was required to operate a restaurant in the hotel using a class C liquor license.

### IV. MAYORAL VETO

The trial court erred in concluding that the mayor had the power to veto the city council's decisions approving the waiver uses.

#### A. STANDARD OF REVIEW

Statutory interpretation is a question of law that is reviewed de novo on appeal. *Eggleston v Bio-Medical Applications of Detroit, Inc*, 468 Mich 29, 32; 658 NW2d 139 (2003). The primary goal of judicial interpretation of statutes is to ascertain and give effect to the intent of the Legislature. *Frankenmuth Mut Ins Co v Marlette Homes, Inc*, 456 Mich 511, 515; 573 NW2d 611 (1998). If the plain and ordinary meaning

of the language is clear, judicial construction is neither necessary nor permitted. *Sun Valley Foods Co v Ward*, 460 Mich 230, 236; 596 NW2d 119 (1999). However, if reasonable minds can differ regarding the meaning of a statute, judicial construction is appropriate. *Adrian School Dist v Michigan Pub School Employees' Retirement Sys*, 458 Mich 326, 332; 582 NW2d 767 (1998). The rules of statutory construction also apply to ordinances, *Gora v Ferndale*, 456 Mich 704, 711; 576 NW2d 141 (1998), and city charters, *Detroit v Walker*, 445 Mich 682, 691; 520 NW2d 135 (1994).

If two statutes lend themselves to a construction that avoids conflict, that construction should control. *House Speaker v State Admin Bd*, 441 Mich 547, 568-569; 495 NW2d 539 (1993). The construction should give effect to each "without repugnancy, absurdity, or unreasonableness." *Michigan Humane Society v Natural Resources Comm*, 158 Mich App 393, 401; 404 NW2d 757 (1987). When two statutes or provisions conflict, and one is specific to the subject matter while the other is only generally applicable, the specific statute prevails. *Gebhardt v O'Rourke*, 444 Mich 535, 542-543; 510 NW2d 900 (1994).

### B. ANALYSIS

The city of Livonia is organized and operates pursuant to the Michigan Home City Rule Act, MCL 117.1 *et seq*. See *Korash v Livonia*, 388 Mich 737; 202 NW2d 803 (1972). Chapter IV, § 24, of the Livonia City Charter states:

> The Mayor shall have the power to veto, except as otherwise in this Chapter provided, which veto, with his reasons

therefor in writing, must be made and filed with the City Clerk prior to the time of the next regular meeting of the Council, at which said meeting the Clerk shall present such veto or vetoes to the Council; provided, however, that if the next regular meeting of the Council following the meeting or adjournment thereof, at which an ordinance or resolution was enacted occurs within seven (7) days of the adjournment, the Mayor shall continue to have the right to veto such ordinance or resolution until the next succeeding regular meeting of the Council. The Council may, only at said meeting, or at any adjournment thereof, reconsider the vote by which such proceedings were passed and adopted; and if it so elects, may, only at said meeting or at any adjournment thereof, readopt such proceedings by an affirmative vote of five (5) of the members elect, in which event the Mayor shall have no further right to veto, and in which event, all such proceedings, except ordinances, shall take effect on the day succeeding said meeting of the Council; and ordinances so passed shall become effective when published according to law, provided, however, that if the next regular meeting of the Council following the receipt of a veto occurs within seven (7) days of the same, the Council shall continue to have the right to re-adopt such proceedings in the manner herein prescribed at the next succeeding regular meeting of the Council. All resolutions and proceedings, not vetoed by the Mayor in the manner and within the time hereinabove specified, shall become effective on the date succeeding the date of the next regular meeting of the Council; and ordinances not so vetoed by the Mayor shall become effective when published and recorded according to law.

As the parties acknowledge, the charter grants broad veto power to the mayor. In *Livonia Drive-In Theatre Co v Livonia*, 363 Mich 438; 109 NW2d 837 (1961), the Supreme Court, interpreting the Livonia Charter, found that the mayor had veto power over not just legislation, but also over administrative matters decided by the city council. In that case, the

plaintiff challenged the right of the mayor to veto a decision of the city council involving the issuance of a license to operate a drive-in theatre on industrially zoned property. In *Livonia Drive-In*, the Court ruled that the mayor had the authority to veto the decision and concluded that there was no valid approval of the plaintiff's application because the city council failed to override the mayor's veto.

Plaintiff argues that *Livonia Drive-In* is not controlling in this case because "[that] decision did not . . . deal with the question of whether the provisions of the CVZA [City and Village Zoning Act, MCL 125.581 *et seq.*] overrode the Charter." Since *Livonia Drive-In* was decided, the CVZA has been substantially revised, with the adoption, in 1978, of MCL 125.584a and 125.584c. According to plaintiff, "Sections 4a and 4c were added to the CVZA to ensure that administrative decisions, such as the waiver use decision involved in the instant case, were based on standards and procedures specified in the zoning ordinance, and were protected from arbitrary, standardless action." In plaintiff's view, "[t]his case thus involves a clash between the provisions of a city charter and the provisions of the CVZA."

In support, plaintiff relies on *Korash, supra*, in which the city defended the use of initiative to amend the Livonia Zoning Ordinance on the ground that the charter provided broadly for enactment of ordinances by initiative. Ruling against the city, the Supreme Court in *Korash* held that, under the CVZA, a zoning ordinance could not be enacted by initiative because the CVZA, a state statute, prevails over the provisions of the city charter. *Id.* at 743 (noting that the Home Rule City Act, MCL 117.36, states that, "No provision

of any charter shall conflict with or contravene the provisions of any general law of the state.").

According to plaintiff, *Korash* controls the outcome of this case because § 4a of the CVZA directs that the zoning ordinance "shall specify . . . the body or official charged with reviewing special land uses and granting approval[,]" MCL 125.584a(1)(a), and "[t]he procedures . . . required for application, review, and approval[,]" MCL 125.584a(1)(c). In accordance with the CVZA, the LZO specifies the procedures for application, review, and approval of a waiver use, and designates the body or official to review and approve waiver uses. Specifically, LZO § 11.03, pertaining to "waiver uses," provides, in pertinent part:

> The following uses are permitted only if specifically recommended by the City Planning Commission and approved by the Council. The Commission shall recommend approval of the use only if it finds that the proposal for such use complies with the special requirements and regulations provided therefor and with the standards set forth in Section 19.06 of this ordinance. . . .

In relevant part, § 19.06 provides:

> Where this ordinance empowers the City Planning Commission to review waivers or approval of conditional uses to be approved by the City Council, such waiver or use shall be approved only where the proposal complies with all of the special requirements for the waiver or use sought to be approved and that the proposal, whether it is for a waiver or use approval, complies with all of the following general standards:
>
> *          *          *
>
> The Commission and/or City Council in acting on any request for waiver or approval of a conditional use, may attach any conditions to its approval which it determines as

necessary to accomplish the reasonable application of the special requirements and the foregoing standards.

The zoning ordinance in question, § 11.03, essentially provides that an application for waiver use is to be reviewed by the planning commission, which then makes a recommendation to the city council for review and ultimate approval or rejection.[2] The relevant zoning ordinance is silent, however, about the role of the mayor in this process. Thus, plaintiff argues that because the zoning ordinance does not give the mayor a role in this process, "the Mayor has no authority to make his own determination as to whether the standards required by the zoning ordinance have been met, and the Mayor has no authority to set aside, reverse, or veto the determination by the City Council." Put in other terms, plaintiff asserts that "[t]he zoning ordinance clearly grants th[e] authority to grant approval for waiver uses to the City Council with no power *whatsoever* granted to the Mayor to overturn the City Council's approval." In this regard, plaintiff points out that defendants' brief in support of their motion for summary disposition concedes as much by admitting that the city council has "absolute discretion" and "exclusive authority" to grant waiver use approvals.

Plaintiff also maintains that *The Raven, Inc v Southfield*, 69 Mich App 696; 245 NW2d 370 (1976),

---

[2] There does appear to be some conflict between the two sections in the LZO. Section 11.03 provides that approval of waiver uses requires both the planning commission's approval *and* the city council's approval. On the other hand, § 19.06 provides that the planning commission reviews waiver uses, which require the approval of city council. Reading the two sections of the LZO together, we believe that the planning commission's approval is not necessary for the final approval of a waiver use and that only the approval of city council is required.

rev'd for reasons stated in dissent, 399 Mich 853; 387 NW2d 925 (1977), is dispositive, thereby supporting its view that the mayor had no veto authority in this case. In *The Raven*, the Supreme Court, reversing the decision of this Court, adopted this Court's dissenting opinion by Judge DANHOF in concluding that the city council's four-to-three decision approving an application for a liquor license was final because the state statute, which gave the mayor no veto power, prevailed over the mayor's general veto power conferred by the city's charter. As plaintiff notes, Judge DANHOF stated in his dissenting opinion that the state statute, which had "only one plain meaning," provided for "a delegation of exclusive legislative power to the City of Southfield's 'legislative body.' " Judge DANHOF further stated that "[t]he statute does not, and the city charter cannot, confer any authority upon the mayor of the city." *The Raven, supra* at 704.

We agree with plaintiff that "under the authority of [*The*] *Raven* and *Korash* and under MCL 117.36, the Mayor had no veto power, and the City Council's approval must stand." Under the CVZA, the zoning ordinance designates "the body or official charged with reviewing special land uses and granting approval." MCL 125.584a(1)(a). Sections 11.03 and 19.06 of the LZO, when read together, provide that city council ultimately makes the decisions regarding applications for special land uses, such as waiver uses. Although the Livonia City Charter grants broad veto power to the mayor, the LZO does not explicitly provide for a mayoral veto with regard to waiver use decisions. Given that the city council chose not to provide for a mayoral veto in the LZO when enacting the special land use provisions of the CVZA, we agree with plaintiff that

the trial court erred in concluding that the mayor had the power to veto the city council's decisions approving the waiver uses.

The complete silence of the LZO regarding mayoral veto power of the waiver use decision of the Livonia City Council requires a judicial adherence to the state statute on the matter before this Court. The city officials in Livonia may wish to specifically provide for mayoral veto power in the future. But, the stark omission of such power is in sharp contrast with the specificity required by MCL 125.584a(1)(a) and (c) with which the Livonia City Council adhered consistently.

Contrary to defendants' claim, reliance upon *Korash* is not misplaced. Although *Korash* was decided before the 1978 amendments of the CVZA pertaining to special land uses, *Korash* remains controlling legal authority for the general proposition that a charter provision may not conflict with or contravene a state statute. Here, we agree with plaintiff that the charter provision pertaining to the veto power of the mayor conflicts with the CVZA, which provides that if a city wishes to provide for special uses, it must do so "in [the] zoning ordinance" and specify the body or official reviewing proposals and deciding on them. MCL 125.584a(1). Under *Korash*, the Livonia charter provision granting the mayor broad veto power does not override the CVZA, which indicates that the zoning ordinance must specify the body or official with the power to grant approvals for special land uses and the procedure for approval. In this instance, §§ 11.03 and 19.06 of the LZO specify that the city council is the body authorized to grant approvals for special land uses. Thus, even though the Livonia City Charter, adopted pursuant to the Home Rule City Act, pro-

vides the mayor with broad veto power over the decisions of city council, the CVZA prevails over the city charter provision, which may not conflict with "any general law of the state" under MCL 117.36 of the Home Rule City Act. Further, the CVZA, as a more specific statute, prevails over the Home Rule City Act in the event of a conflict concerning the Livonia City Charter provision regarding mayoral veto power. *Gebhardt, supra* at 542-543. Provisions of the LZO, namely, §§ 11.03 and 19.06, which were enacted pursuant to the CVZA, do not grant the mayor the power to veto the city council's approval of a special land use decision, such as a waiver use; thus, the city council's decisions approving the waiver uses in this case must stand as final decisions.

Further, contrary to defendants' contention, the power of the mayor to veto land use decisions of the city council does present a conflict with the procedures set forth in the CVZA because the zoning ordinance, § 11.03, provides no authority to the mayor to veto the city council's approval. Indeed, defendants' admission that "[t]he subsequent veto by the Mayor served only to force a super-majority vote requirement on the part of the City Council in order to grant final approval of the petitions" is a clear recognition that the charter provision conferring veto power upon the mayor conflicts with the procedures set forth in the CVZA and expressed in the zoning ordinance, which only requires the city council's approval by a majority vote, not a supermajority vote.

In addition, contrary to defendants' claim, *The Raven* is, for relevant purposes, not distinguishable from the present case. In *The Raven*, the statute provided the exclusive authority to the city council,

while in this case the CVZA, as an enabling statute, directs the zoning ordinance to provide the grant of authority. Although defendants point out that "the CVZA contains no state mandate as to the appropriate body or official to consider special land use requests and instead provides that cities shall make this determination by designating such body or official in their zoning ordinance," the critical legal fact remains that, in both *The Raven* and this case, the grant of exclusive authority was unequivocal. In *The Raven*, the grant of exclusive authority came directly from the statute, whereas in this case it proceeds from a zoning ordinance enacted pursuant to the statute. In our view, this is a distinction without an essential legal difference because in both instances the exclusive authority is statutorily based.

Contrary to defendants' contention, *Oakland Co Comm'r v Oakland Co Executive*, 98 Mich App 639; 296 NW2d 621 (1980), is not applicable. In *Oakland Co Comm'r*, the issue involved the county executive's veto power under the optional unified form of county government adopted by Oakland County. Pursuant to MCL 45.561, the county executive may veto any ordinance or resolution adopted by the board of commissioners. In that case, the voters in Oakland County, as authorized by the statute, expressly chose to grant veto power to the county executive. In *Oakland Co Comm'r*, this Court held that the statutes in question were not in conflict, but were "completely harmonious," where "[t]he ability of the board of commissioners to vote . . . does not conflict with the ultimate veto power of the county executive, nor with the board of commissioners' subsequent ability to override such vetoes." *Id.* at 652. Unlike *Oakland Co*

*Comm'r*, where there was no conflict between the statutes, there is a conflict between the statutes in question here (the CVZA and the Home Rule City Act). As plaintiff points out, "the applicable statute authorized the City to designate in the zoning ordinance the body or official empowered to grant or deny special use approval and to specify the procedures applicable. The City could have chosen to provide in its zoning ordinance for a role for the mayor in the special use process, but it chose not to." Moreover, as plaintiff rightly argues, *Oakland Co Comm'r* is actually consistent with *The Raven* in that "[b]oth cases stand for the proposition that there is no inherent veto power, and that one must look to the controlling statute."

Finally, as plaintiff notes in its supplemental brief, this Court's recent decision in *Harbor Telegraph 2103, LLC v Oakland Co Bd of Comm'rs*, 253 Mich App 40; 654 NW2d 633 (2002), "while not directly on point, is instructive." In *Harbor Telegraph*, this Court stated that "[t]he clear and unambiguous language of MCL 45.561 inescapably leads to our conclusion that the county executive possessed the authority to veto the board of commissioners' detachment resolution . . . ." *Id.* at 54. As plaintiff points out, "[t]he executive veto is a creature of statute" and does not exist unless the statute creates it. The reasoning, as applied to the present case, is that because there is no inherent veto power, one must look to the controlling statute to determine whether veto power has been granted. Thus, because neither the CVZA nor the zoning ordinance explicitly granted veto power to the mayor regarding special land use decisions, the

mayor did not have the power to veto the city council's approval of the waiver uses in this case.

## V. CONCLUSION

The mayoral veto issue is dispositive of this appeal. Plaintiff's remaining issues are based on the supposition that the mayor did have veto power and, because we find that he did not, we decline to reach the remaining issues. Accordingly, we reverse the trial court's order dismissing plaintiff's complaint. The mayor had no power to veto the city council's special land use decisions; therefore, we remand for entry of a judgment granting plaintiff's motion for summary disposition under MCR 2.116(I), affording it the relief requested in its complaint, specifically a declaration that the waiver use approvals granted by the city council have full force and effect and an order directing defendants and their agents to issue "a certificate of occupancy and such other approvals and permits as are required to permit the operation of the proposed Hooters restaurant within the restaurant portion of the premises upon presentation of plans which comply with the City's building code."

Reversed and remanded for entry of an order granting plaintiffs' motion for summary disposition under MCR 2.116(I). We do not retain jurisdiction.